IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RAHOOL MAKANI,                    §
                                 §
            Plaintiff,            §
                                 §
v.                               §        Civil Action No. 3:21-CV-00118-E
                                 §
COREY BREWER                     §
                                 §
            Defendant.           §

## ORDER AND MEMORANDUM OPINION

Plaintiff Rahool Makani filed this suit against Defendant Officer Corey Brewer of the Carrollton, Texas Police Department in his individual capacity under 42 U.S.C. § 1983, asserting that Defendant Brewer violated his constitutional rights under the Fourth and Fourteenth Amendment to the United States Constitution. Specifically, Plaintiff Makani asserts claims for excessive force and illegal entry. On October 7, 2021, Defendant filed a Motion for Summary Judgment, (Doc. 19), seeking dismissal of both claims under the doctrine of qualified immunity. On September 26, 2022, this Court issued a separate Order, (Doc. 35), granting Defendant's Motion for Summary Judgment. The Order stated that "[a]n opinion containing the grounds for the Court's decision is forthcoming." (Doc. 35). Hereunder, the Court explains its reasoning for granting Defendant's Motion for Summary Judgment, thereby dismissing all of Plaintiff's claims.

## I.   BACKGROUND

This case arises out of the arrest of Plaintiff Rahool Makani ("Makani") in the early morning hours of June 9, 2019. At 1:05 a.m. on June 9, 2019, Makani's sister-in-law, Fouzia Rahman ("Ms. Rahman"), called 911 from Makani's residence in Carrollton, Texas regarding Makani's behavior. Ms. Rahman informed the 911 dispatcher that Makani had assaulted his sister

and mother, that his siter told Ms. Rahman to call 911, and that Ms. Rahman was hiding in a bedroom upstairs out of fear of continued violence. (Doc. 21, 8: 911 call at 0:35-1:30; 3:54-4:04). Ms. Rahman informed 911 that Makani was intoxicated, had broken a door in the residence, threatened his mother, and was hurting people in the residence—including Makani's mother and sister. Ms. Rahman called 911 from an upstairs bedroom, indicated to the 911 operator that she was afraid to be downstairs with Makani, and was unsure whether Makani had any weapons or whether there were weapons in the home.

Based on the contents of the 911 call, officers from the Carrollton Police Department ("CPD")—including Defendant Corey Brewer ("Brewer")—were dispatched to the Makani residence. The call was coded as "Priority 1"—the second highest priority level for the Carrollton Police Department—meaning that officers would be responding to an "[o]ffense against persons, in progress, happening now." (Doc 21, pg. 16: Event Report; Doc. 21, pg. 37: CPD Standard Operating Procedure). From 1:05:51 a.m. until 1:10:13 a.m., dispatchers conveyed the following information to officers on patrol, including Brewer: (1) a female caller, who is out of breath, advised that a male at the location is drunk and hurting people; (2) the caller did not know whether the individual head weapons; (3) caller advised that the individual is pulling people's hair; (4) the individual is Rahool Makani—a 27 year old Asian male; (5) the individual had broken a door; (6) the location was the individual's own home; (7) the individual had been violent with his sister and mother and had pushed them; (8) the individual was looking for his car keys, and others in the residence would not give them to him because he is intoxicated; (9) the individual held his mother down, saying "give me the keys;" (10) the individual is downstairs and the caller is upstairs in a bedroom because she is afraid to be downstairs; and (11) the caller advised that there may be weapons in the home, but she is not sure. (Doc. 21, pg. 22: Event Report, pg. 7).

---

MEMORANDUM OPINION AND ORDER                                                    Page **2** of **38**

Officer Brewer was on patrol in the early morning hours of June 9, 2019. He received the "Priority 1" call and testifies that he understood the code to mean that there was a "major disturbance" occurring at the Makani residence. (Doc. 21, pg. 47: Brewer Aff. ¶ 3). Brewer proceeded to the residence in his squad car and, while en route, received the dispatch notes above. Brewer testifies that—based on the dispatch notes—he "was aware that someone in the house had called 911 to report that an intoxicated man in his mid-twenties was fighting with people in the residence, hurting family members, had broken a door, . . . was trying to get car key[,] [and] that weapons might be present in the house." (Doc. 21, pg. 47: Brewer Aff. ¶ 8). Brewer also testifies that—based on the dispatch notes and his experience in the Carrollton Police Department—he "believed that this dispatch call reflected a serious situation involving family violence." (Doc. 21, pg. 47: Brewer Aff. ¶ 9).

At approximately 1:11 a.m., Brewer arrived in his squad car to the Makani residence; he was the first officer to arrive. The facts as to what occurred when Brewer pulled up to the residence are disputed. According to Brewer's sworn testimony and deposition, he heard loud screaming outside of the home as he pulled up. (Doc. 21, pg. 49: Brewer Aff. ¶ 11). Brewer contends that this is corroborated by the dispatcher's notes in the event report, which indicate that Brewer told dispatch that he could "hear loud screaming" and said, "Units set it up." (Doc. 21, pg. 22: Event Report, pg. 7). According to Brewer, "set it up" is a term that law enforcement officers use to "indicate that they are facing an active altercation and that they are in need of immediate backup." (Doc. 21, pg. 49: Brewer Aff. ¶ 13). Makani contests Brewer's assertion that there was loud screaming when Brewer arrived at the residence, testifying that "[i]n the minutes leading up to Officer Brewer entering [the] home, no one at [the] house had been yelling, screaming, or loudly arguing." (Doc. 29, pg. 65: Makani Decl., ¶ 4).

---

MEMORANDUM OPINION AND ORDER                                                      Page **3** of **38**

Brewer testifies that he activated the recording feature on his body camera after he heard loud screaming and told dispatch to have units "set it up." (Doc. 21, pgs. 48-49: Brewer Aff. ¶ 10-12). Both parties have submitted into evidence the recording captured by Brewer's body camera. The video recording begins as Brewer pulls up to the Makani residence in his squad car. However, the video is silent for the first thirty seconds. According to Brewer, even though the body camera is always on, it does not record video unless the feature is activated by the officer. The recording feature retains the video feed beginning approximately thirty seconds before the feature is activated, but it only retains audio from the moment the feature is activated. Because the video is silent for the first thirty seconds, it does not corroborate either Brewer or Makani's contention as to whether there was a loud argument occurring when Brewer arrived at the residence.

The rest of the events of that morning, however, are clearly depicted by both the audio and video recording. Brewer, upon exiting his squad car, walked up to the front door of the Makani residence, which was slightly ajar as Brewer approached it. With his flashlight in his left hand, Brewer pushed the door fully open with his right hand without knocking or announcing his presence. Once the door was fully open, two individuals could be seen talking in the foyer of the home—a shirtless man in his mid-twenties with his back to the door, later identified as Makani, and a middle-aged woman facing the door, later identified as his mother.

Upon pushing the door fully open, Brewer stepped just inside of the residence and immediately says, "Hey, what's the problem? Get outside. Get outside now." Makani then turned towards the door and attempts to close it with his right hand. Brewer responded by grabbing hold of Makani's right wrist with his right hand and pulling it off of the door. Makani's mother then approached and wrapped her arms around Makani's right arm and told Brewer that the situation was "a family matter." Brewer then put away his flashlight, removed Makani's mother's hand from

his wrist, and told her to "back up" four times. The mother repeatedly placed her hand on Brewer's wrist and repeatedly said that the situation was a "family matter." Meanwhile, Makani said to Brewer, "I didn't allow you to come inside this house . . . who allowed you come inside this house." Makani then grabbed the door to the residence with his left hand and attempted to pull his arm away from Brewer's grasp.

During this portion of exchange, a teenage woman—later identified as Makani's younger sister—walked into the entry hall and approached Makani, the mother, and Brewer The young woman wrapped her arms around her mother's right arm and attempted to pull her away from the fray. Brewer then told dispatch to "close the channel." Brewer testifies that that he did this because he "thought [he] was in a dangerous situation, and [he] needed to be able to communicate with dispatch on a priority basis." (Doc. 21, pg. 50: Brewer Aff. ¶ 20). Brewer then grabbed Makani's right arm with his left hand and attempted to pull Makani outside of the residence—this time with both arms—repeatedly telling Makani to "get outside right now." Makani responded by attempting to pull away from Brewer's grasp and pulling Brewer a few steps farther into the residence, while repeatedly asking, "Who allowed you to come inside this house?" Makani then grabbed hold Brewer's right wrist with his left hand in an apparent attempt to free himself from Brewer's grasp. Brewer responded by immediately removing Makani's hand and saying, "Get off of me." Makani then backed farther into the residence, pulling Brewer with him. Brewer, holding Makani's left wrist in his left hand and his right hand on Makani's left shoulder, said to Makani, "Do not touch me."

At this point, Brewer was fully inside of the residence and was surrounded by three individuals—Makani, the mother, and the sister. Brewer then twisted Makani's left arm behind Makani's back and took him to the ground. As Makani went to the ground, his face hit the tile

floor of the entry hall. Makani testifies that Brewer "slammed [him] face first onto [the] hard tile floor causing injuries to his head and face, including a deep cut in [his] lip which bled profusely." (Doc. 29, pg. 66: Makani Decl. ¶ 14). Brewer testifies that the arm-twisting technique he used to gain physical control over Makani is known as an "arm-bar takedown." (Doc. 21, pg. 50: Brewer Aff. ¶ 23). Brewer further testifies that, in his experience, suspects who are brought into custody by way of an arm-bar takedown are usually able to brace themselves as they are being taken down. (Doc. 21, pg. 50: Brewer Aff. ¶ 23). However, at this point, Brewer had hold of Makani's left arm, and Makani's mother had hold of Makani's right arm. Brewer testifies that, when he executed the takedown, Makani's legs went out from underneath him abruptly and, because Makani's mother had hold of Makani's right arm, Makani hit the floor face first without bracing himself. (Doc. 21, pg. 50: Brewer Aff. ¶ 24).

With Makani lying face down on the entry hall floor, Brewer placed Makani's left hand in handcuffs. Brewer then ordered Makani to put his right arm behind his back, grabbed and pulled Makani's right arm behind his back, and placed it in handcuffs as well. Once Makani was fully handcuffed, Brewer immediately radioed dispatch to inform them that he had an individual in custody and to send paramedics.

Shortly thereafter, other Carrollton police officers arrived and conducted interviews of the individuals at the scene. Makani's sister informed officers that Makani had grabbed and squeezed her arm, causing her pain, and had grabbed her by the waist and pulled her to the ground. Makani's sister and mother also told the officers that Makani had grabbed his mother's chin and the back of her neck, pushed her back and forth, pushed her against a wall, and pulled her hair. Makani was arrested for the charge of assault causing bodily injury—family violence.

Makani suffered injuries to his face and head as a result of the arrest, including a bloody nose and a deep cut to the inside of his upper lip. Makani was transported to the emergency room at the Baylor Medical Center in Carrollton, Texas, to receive treatment for his injuries. There, he was diagnosed with alcohol intoxication, facial contusion, dehydration, and an unspecified head injury. At 4:00 am, approximately three hours after the 911 call, Makani had a blood alcohol content of 0.227%. At 7:01 am, approximately six hours after the 911 call, Makani's blood alcohol content was 0.16%. At around 9:45 am, Makani was discharged from the hospital. Makani returned to Baylor Medical Center in the early morning hours of June 12, 2019, complaining of a headache. After receiving a computed tomography ("CT") scan, Makani was diagnosed with a concussion and was discharged.

On January 19, 2021, Makani filed his Original Complaint, asserting two causes of action against Brewer in his individual capacity under 42 U.S.C. § 1983. (Doc. 1). Specifically, Makani alleges that Brewer—acting under the color of law—violated his Fourth and Fourteenth Amendment rights to be free from excessive force and illegal searches. (Doc. 1). On February 9, 2021, Brewer filed his Answer to the Original Complaint, asserting—*inter alia*—the affirmative defense of qualified immunity. (Doc. 5). This Court issued a Qualified Immunity Scheduling Order on March 17, 2021. (Doc. 13). On October 7, 2021, Brewer submitted a Motion for Summary Judgment seeking to dismiss Makani's claims on the grounds of qualified immunity. This Court issued an Order granting Brewer's Motion for Summary Judgment on September 26, 2022, (Doc. 35), with opinion to follow. Below is the Court's reasoning in support of that Order.

## II.   Legal Standard

### A.   Summary Judgment

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). A dispute of a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Id*. The moving party bears the burden of showing that summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 323. The moving party meets its burden by informing the Court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. Fed. R. Civ. P. 56; *Celotex Corp.*, 477 U.S. at 323.

When reviewing the evidence on a motion for summary judgment, the Court must decide all reasonable doubts and inferences in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). The Court cannot make a credibility determination in light of conflicting evidence or competing inference. *Anderson*, 477 U.S. at 255. As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Id.* at 250.

### B.   Qualified Immunity

Under 42 U.S.C. § 1983, private citizens may sue public officials for violations of their federal statutory or constitutional rights. *See Monroe v. Pape*, 365 U.S. 167, 1717 (1961). However, public officials are shielded from civil liability under § 1983 under the doctrine of

---

qualified immunity "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Qualified immunity gives government officials breathing room to make reasonable[,] but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743) (internal quotation marks omitted).

The affirmative defense of qualified immunity has two prongs: (1) whether an official's conduct violated a statutory or constitutional right of the plaintiff, and (2) whether the right was "clearly established" at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). The two steps of the qualified immunity inquiry may be performed in any order. *Pearson*, 555 U.S. at 236. "A court may rest its analysis on either prong[.]" *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (citation omitted).

The "clearly establish" prong of the qualified immunity analysis "'is better understood as two separate inquiries: [(1)] whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, [(2)] whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law.'" *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (quoting *Felton v. Polles*, 315 F.3d 470, 477 (5th Cir. 2002)). "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Turner v. Lieutenant Driver*, 848 F.3d 678, 685 (5th Cir. 2017) (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "For conduct to be objectively unreasonable in light of clearly established law, there need not be a case directly on point, but 'existing precedent must have placed

the statutory or constitutional question beyond debate.'" *Tucker v. City of Shreveport*, 998 F.3d 165 (5th Cir.) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)), *cert. denied sub nom. Tucker v. City of Shreveport, Louisiana*, 211 L. Ed. 2d 388, 142 S. Ct. 419 (2021). "Thus, when considering whether a defendant is entitled to qualified immunity, [] court[s] 'must ask whether the law so clearly and unambiguously prohibited his conduct that *every* reasonable official would understand that what he is doing violates [the law]." *Turner*, 848 F.3d at 685-86 (emphasis and third alteration in original) (quoting *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc)). "To answer that question in the affirmative, [a court] must be able to point to controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right question with a high degree of particularity." *Morgan*, 659 F.3d at 371-72.

An officer's invocation of the qualified immunity defense "alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010); *see also Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007). Where, as here, a defendant has properly asserted qualified immunity, "the plaintiff has the burden of negating the application of the doctrine." *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016). The plaintiff must "rebut the defense by establishing that the official's allegedly wrongful conduct clearly violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct." *Gates v. Texas Dep't. of Protective and Regul. Servs.*, 537 U.S. 404, 419 (5th Cir. 2008).

While the invocation of qualified immunity alters the typical burden of proof, the Fifth Circuit has explained that:

> At the summary judgment stage . . . all inferences are still drawn in the plaintiff's favor. [*Brown*, 623 F.3d] at 253. This is true "even when ... a court decides only the clearly-established prong of the [qualified immunity] standard." *Tolan v. Cotton*, 572 U.S. 650, 657, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014). Likewise, "under

> either [qualified immunity] prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 656, 134 S.Ct. 1861. "Accordingly, courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* at 657, 134 S.Ct. 1861; *see, e.g., Tarver*, 410 F.3d at 754 (dismissal at summary judgment phase inappropriate because determining whether officer's conduct was objectively unreasonable in light of clearly established law required factfinding and credibility assessments).

*Tucker*, 998 F.3d at 173. While a plaintiff's version of the facts is generally accepted as true in a motion for summary judgment based on qualified immunity, a "narrow exception" to this approach exists where "video evidence undeniably contradicts the plaintiff's version of the facts such that no reasonable jury could believe it." *Chacon v. Copeland*, 577 F. App'x 355, 358 (5th Cir. 2014) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). When such video evidence exists, the Fifth Circuit has said that courts "need not rely on the plaintiff's description of the facts . . . but instead consider 'the facts in the light depicted by the videotape.'" *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (quoting *Scott*, 550 U.S. at 381).

Finally, whether every reasonable officer would consider a defendant's conduct to violate clearly established law is an "objective (albeit fact-specific) question." *Creighton*, 483 U.S. at 641. Thus, "[w]hen evaluating a qualified immunity defense, [courts] 'consider[] only the facts that were knowable to the defendant officers.'" *Tucker*, 998 F.3d at 173 (quoting *White*, 580 U.S. at 77). Accordingly, a defendant's subjective state of mind has no bearing on whether he or she is entitled to qualified immunity. *Creighton*, 483 U.S. at 641.

### III.   ANALYSIS

Makani asserts two claims against Brewer in his individual capacity under 42 U.S.C. § 1983 for the alleged violation of his Fourth and Fourteenth Amendment rights to be free from (1) excessive force and (2) illegal searches. For the reasons discussed below, the Court concludes that

---

MEMORANDUM OPINION AND ORDER                                      Page **11** of 38

Brewer is entitled to qualified immunity on each of these claims. Therefore, summary judgment must be granted, and the claims must be dismissed.

## A.      Count One—Excessive Force

### 1.      *Constitutional Violation*

The Court concludes that Brewer is entitled to summary judgment on Makani's excessive for claim because Makani has not established that Brewer violated his Fourth Amendment right to be free from unreasonable seizure. "For purposes of liability under 42 U.S.C. § 1983, excessive force claims arising from an arrest or investigatory stop invoke the protection provided by the Fourth Amendment of the United States Constitution against 'unreasonable seizure.'" *Tucker*, 998 F.3d at 171. To prevail on a Fourth Amendment excessive force claim under § 1983, a plaintiff must establish: (1) an injury; (2) that the injury resulted from force that was clearly excessive; and (3) that the excessiveness of the force was clearly unreasonable. *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016). The parties do not contest that Makani suffered an injury when his face hit the floor upon Brewer taking him to the ground. Thus, the issue before the Court is whether the takedown was clearly excessive and objectively unreasonable under the totality of the circumstances. The Court concludes that it was not.

Because "inquiries regarding whether a use of force was 'clearly excessive' or 'objectively unreasonable . . . are often intertwined,'" courts may consider those questions simultaneously. *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017) (citing *rr v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012)). In doing so, a court's analysis must be objective: "'the question is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them[.]'" *Poole*, 691 F.3d at 628 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (some internal quotation marks omitted). Courts "must evaluate an officer's use of force 'from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Poole*, 691 F.3d at 628 (quoting *Graham*, 490 U.S. at 396) (some internal quotation marks omitted). This allows for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S at 396-97.

"Excessive force claims are necessarily fact-intensive" and "depend[] on the fact and circumstances of each particular case." *Deville v. Marcantel*, 567 F.3d 156, 169 (5th Cir. 2009) (per curiam). In *Graham v. Connor*, the Supreme Court identified three factors relevant to assessing an excessive force claim: (1) "the severity of the crime[;]" (2) "whether the suspect poses an immediate threat to the safety of the officers or others[;]" and (3) whether the suspect is "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Courts "must determine whether the 'totality of the circumstances justified' the particular use of force." *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008) (quoting *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). Ultimately, the inquiry is whether the use of force was reasonable "under the facts as a reasonable officer *would perceive them*." *Griggs*, 841 F.3d at 313 (emphasis in original).

Applying the *Graham* factors, the Court concludes that Officer Brewer's use of an arm bar takedown to gain physical control over Makani was neither clearly excessive nor objectively unreasonable under the circumstances. As to the first factor, Officer Brewer was called to the Makani residence to investigate a serious crime of family violence. *See Georgia v. Randolph*, 547 U.S. 103, 117 (2006) ("[W]e recognize that domestic abuse is a serious problem in the United States."); *see also Rockwell v. City of Garland*, No. 308-CV-251-M, 2010 WL 3384833 (N.D. Tex. June 10, 2010), *report and recommendation adopted*, No. 3:08-CV-251-M-BF, 2010 WL 3384826 (N.D. Tex. Aug. 26, 2010), *aff'd sub nom. Rockwell v. Brown*, 664 F.3d 985 (5th Cir. 2011)

---

MEMORANDUM OPINION AND ORDER

(explaining that the Texas Legislature has noted the gravity of domestic and family violence); TEX. CODE CRIM. PROC. ANN., art. 5.01, Legislative Statement (1985) ("Family violence is a serious danger and threat to society and its members. Victims of family violence are entitled to the maximum protection from harm or abuse or the threat of harm or abuse as is permitted by law."); *id.*, art. 14.03 (authorizing warrantless arrest where there is probable cause of family violence). Thus, this factor weighs in Brewer's favor.

As to whether a reasonable officer would have perceived Makani as an immediate threat, this "second factor is the most important." *Malborough v. Stelly*, 814 F. App'x 798, 803 (5th Cir. 2020). Having reviewed the video recording of the dispute, the Court concludes that, under the totality of the circumstances, a reasonable officer in Brewer's situation could have perceived Makani as an immediate threat. In his summary judgment response, Makani contends that he did not pose an immediate threat to the safety of Officer Brewer or others in the home because he "[a]t no point . . . threaten[ed] [Brewer] or any other person in [Brewer's] presence." (Doc. 28, pg. 14). Brewer contends that, when he executed the arm bar takedown, he perceived a threat to himself because he had been pulled into the house, was surrounded by multiple individuals, and feared that those individuals may overpower him and gain access to his weapons. (Doc. 21, pg. 50: Brewer Aff. ¶¶ 22-23). Brewer further testifies that Makani clenched his fist, which Brewer perceived as an act of aggression. (Doc. 21, pg. 49: Brewer Aff. ¶ 17)**.** Makani contests this assertion and testifies that his "hand was not clenched in a fist in any aggressive manner." (Doc. 28, pg. 14). Brewer also testifies that he felt Makani "tense[] up his arm and body," which Brewer "considered to be a display of defensive resistance." (Doc. 21, pg. 49: Brewer Aff. At ¶ 18). Finally, Brewer testifies that he considered Makani's action of grabbing his right wrist to be "active aggression." (Doc. 21, pg. 50: Brewer Aff. ¶ 21).

---

MEMORANDUM OPINION AND ORDER

While the Court must construe the evidence in the light most favorable to Makani, it cannot accept as true his conclusory assertion that he did not pose an immediate threat to the safety of Brewer or others. *See Simmons v. Lyons*, 746 F.2d 265, 269 (5th Cir. 1984); *Broadway v. City of Montgomery*, 530 F.2d 657, 660 (5th Cir. 1976) (affidavits that recite "supported allegations, conclusory in nature[,]" are "insufficient to avoid summary judgment"). Additionally, although the Court "review[s] the evidence in the light most favorable to the nonmoving party, [it] assigns greater weight, even at the summary judgment stage, to the facts evidence from video recordings taken at the scene." *Carnaby*, 636 F.3d at 187 (citing *Scott*, 550 U.S. at 381 (2007). Upon review of the video evidence provided by both parties, the Court concludes that a reasonable officer in Brewer's position could have believed that Makani posed a threat to the safety of Brewer and others.

At the time Officer Brewer executed the arm bar takedown, he was inside of the home, surrounded by multiple individuals. Makani disputes Brewer's contention that Brewer was pulled into the residence, instead asserting that he backed away from the door and Brewer approached him as he backed away. (Doc. 28, pg. 15). However, Makani's assertion is contrary to the video, which shows that Makani attempted to pull is right arm away from Brewer's grasp, pulling Brewer further into the home. (Doc. 21, pg. 8: Brewer Body Cam, 1:10-1:17). When Brewer took Makani to the ground, he was fully inside of the home, did not know how many others were present, whether they had weapons, or whether they would join in Makani's resistance as Makani's mother had done. (Doc. 21, pg. 50: Brewer Aff. ¶ 22). At that time, Makani had not been searched for weapons, and Brewer was aware that there may have been weapons in the home. Under these circumstances, the Court concludes that it was reasonable for Brewer to perceive Makani as an immediate threat.

As to the third *Graham* factor, the Court concludes that a reasonable officer in Brewer's situation could have concluded that Makani was actively resisting arrest. "Officers may consider a suspect's refusal to comply with instructions . . . in assessing whether physical force is needed to effectuate the suspect's compliance." *Deville*, 567 F.3d at 167. Makani contends that he was not actively resisting arrest when Officer Brewer took him to the ground using the arm bar technique. The Court concludes, however, that the video evidence depicts a scenario in which a reasonable officer could conclude that Makani was actively resisting arrest.

The video shows that Makani refused to comply with Brewer's repeated orders to step outside of the home. The video evidence shows that Makani continually attempted to pull away from Brewer's grasp. Makani does not contest the fact that he attempted to pull his right arm away from Brewer's grasp. However, Makani does contest Brewer's assertion that he grabbed Brewer's wrist—Makani asserts that he "placed [his] hand on Officer Brewer's hand has [his] mother had done" and that he "did not squeeze Officer Brewer's hand[.]" (Doc. 29, pg. 66: Makani Decl., ¶ 11). However, the video evidence clearly shows that Makani put his right hand on top of and wrapped his fingers around Brewer's left wrist. Given Makani's continual refusal to comply with Brewer's commands, his persistent efforts to pull away from Brewer's grasp, and his act of grabbing Brewer's wrist, the Court concludes that—under the totality of the circumstances—it was reasonable for Brewer to believe that Makani was actively resisting.

Moreover, the force used by Brewer did not exceed the amount necessary to gain physical control over Makani. "Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion." *Graham*, 490 U.S. at 396. "However, officers must assess not only the need for force, but also the relationship between the need and the amount of force used.'" *Deville*, 567 F.3d. at 167 (quoting

*Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)). Viewing the evidence in the light most favorable to Makani—including the video that captures the dispute underlying Makani's claims— the Court concludes that, under the totality of the circumstances, Brewer's action of taking Makani down to the ground was not disproportionate to the need.

Brewer used only his bare hands. He did not strike Makani. He did not use mase or a taser, and he did not brandish any weapon. Instead, he used an open-handed technique to bring Makani to the ground so that he could place him into handcuffs. Brewer was forced to make a split-second decision to gain control over Brewer to deescalate the dispute. Finally, his use of force ceased the moment Makani was in handcuffs, at which time he immediately called for medical assistance.

Viewed objectively, Brewer responded with "'measured and ascending' actions that corresponded to [Makani's] escalating verbal and physical resistance." *Poole*, 691 F.3d at 629 (citing *Galvan v. City of San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010) (explaining that the use of force was reasonable when it involved "measured and ascending responses" to a plaintiff's noncompliance)). The situation was "tense, uncertain, and rapidly evolving," and Brewer's use of force was reasonable and commensurate to the need. *Graham*, 490 U.S. at 396. Brewer was faced—as the sole responding officer—with an intoxicated individual suspected of committing a serious crime of family violence. It was reasonable for Brewer to believe that Makani posed an immediate threat to the safety of Brewer or others when he was inside of the home, surrounded by multiple individuals, and did not know if weapons were present in the home. It was also reasonable for Brewer to believe that Makani—who refused to comply with his verbal instructions, continually tried to pull away from his grasp, and grabbed Brewer's arm in an apparent attempt to free himself—was actively resisting. Finally, Brewer used only the physical force necessary to

---

gain physical control over Makani, and the evidence establishes that the amount of force used was appropriate for the situation.

Thus, no fact issue exists as to whether Brewer's use of force was objectively reasonable and commensurate to the situation's need, and the Court concludes that Makani has not established that Brewer violated his Fourth Amendment right to be free from excessive force.

2. *Clearly Established Law*

Alternatively, Brewer is entitled to summary judgment on Makani's excessive force claim because Makani has not met his "heavy" and "demanding" burden of showing that Brewer's use of force violated clearly established law. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019). Although the Supreme Court "caselaw does not require a case directly on point for a right to be clearly establish, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, — U.S. —, 138 S. Ct. 1148, 1152 (2018). "It is the plaintiff's burden to find a case in his favor that does not define the law at a 'high level of generality.'" *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (quoting *Cass v. City of Abeline*, 814 F.3d 721, 732-33 (5th Cir. 2016)). "[O]utisde of an obvious case, the law is only clearly established if a prior case exists where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Hanks*, 853 F.3d at 747 (quoting *White*, 580 U.S. at 80) (internal quotation marks omitted). If, however, officers of "reasonable competence could disagree on [whether the conduct is legal], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Makani points the Court to several cases in support of his argument that the following principles of law were clearly established on June 9, 2019: (1) where an individual's conduct amounts to mere passive resistance, use of force is not justified; and (2) a constitutional violation occurs when an officer violently slams an arrestee who is not actively resisting arrest. (*See* Doc.

---

MEMORANDUM OPINION AND ORDER                                                    Page **18** of 38

28, pgs. 31-33). But those cases are not sufficiently analogous to the facts at issue and do not "squarely govern the particular facts at issue here such that, in [June 2019], *no* reasonable officer would have thought that [Brewer's] takedown of [Makani] was legally permissible." *Tucker*, 998 F.3d at 176 (emphasis in original). Thus, Makani has not carried his burden of showing that Brewer's actions violated clearly established law.

With respect to Makani's contention that the use of force is not justified when an individual is merely "passively resisting" an officer, Makani points the Court to *Trammell v. Fuge*, 868 F.3d 332, 341 (5th Cir. 2012). In *Trammell*, the Fifth Circuit held it was objectively unreasonable in light of clearly established law for several officers to tackle an intoxicated plaintiff that was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp. *Id.* at 341. However, *Trammell* is distinguishable from the case at hand along each of the three factors identified in *Graham* as relevant to the excessive force inquiry.

First, the plaintiff in *Trammell* was suspected of driving under the influence. *Id.* at 337. Here, Makani was suspected of committing a violent crime: assault causing bodily injury—family violence. Because the crime being investigated here was of greater severity than the crime in *Trammell,* this factor cuts against Makani's contention that *Trammell* placed Brewer on notice that his actions constituted excessive force. Thus, *Trammell* is distinguishable from the case at bar on the first *Graham* factor.

Second, in *Trammell*, a fact question existed as to whether the officers believed that the plaintiff posed a danger to himself or others. *Id.* at 340. There, the Fifth Circuit held—based on the video recording of the encounter—that it was unreasonable for the officers to believe that: (1) the plaintiff could endanger himself by stumbling into the roadway because it did not appear that the plaintiff was about to fall over; and (2) the plaintiff would harm others by getting on his

motorcycle and driving away because he had stepped away from the motorcycle, which was turned off and parked on a center stand. *Id.* By contrast, as discussed above, the video evidence here indicates that it was reasonable for Brewer to believe that Makani posed a danger to Brewer or others in the home. Brewer was engaged in a protracted struggle to gain physical control of Makani, surrounded by multiple other individuals, had been pulled deeper into the residence, and did not know whether there were weapons present in the home. Moreover, unlike in *Trammell*—where four officers were interacting with only the plaintiff—Brewer was the sole responding officer on the scene and was surrounded by multiple individuals, two of whom—Makani and Makani's mother—had placed hands on Brewer already. Thus, *Trammell* is distinguishable from the case at bar on the second *Graham* factor.

Third, in *Trammell*, a fact question existed as to whether it was reasonable for the officer to believe that the plaintiff was actively resisting arrest. *Id.* at 341. There, the plaintiff only pulled his arm away from the defendant officer a few inches, and the officer was not pulled forward towards the plaintiff whatsoever. *Id.* at 341-42. Here, Makani continually attempted to pull away from Brewer and anchored himself by pushing off the front door the residence. Unlike the officer in *Trammell*, Brewer was pulled forward by Makani's attempts to pull away from Brewer's grasp. Moreover, unlike the plaintiff in *Trammell,* Makani grabbed Brewer's arm in what can be reasonably construed as an attempt to free himself from Brewer's grasp.

Additionally, the quickness with which the officers in *Trammell* resorted to force further distinguishes the case at bar. *See id.* at 342 (citing *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012); *Deville*, 567 F.3d at 167) ("This Court has several times found that the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need."). There, only three seconds elapsed between the officers' instructions for the plaintiff to place his

hands behind his back and the officers tackling the plaintiff to the ground. Thus, the Fifth Circuit concluded that "a reasonable jury could infer that the officers used very little, if any, negotiation before resorting to physical violence, and that the officers' conduct did not constitute the required 'measured an ascending' actions calibrated to [the plaintiff's] conduct." *Id.* at 342 (citing *Poole*, 691 F.3d at 629). By contrast, more than twenty seconds elapsed between Brewer's instruction for Makani to step outside and the takedown, during which time Brewer repeated the instruction multiple times. Moreover, the takedown only occurred after Makani escalated the encounter by grabbing Brewer's wrist. For these reasons, the Court must conclude that *Trammell* is distinguishable from the case at bar and is not the sort of "prior case . . . where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment" required for a determination that Brewer acted objectively unreasonably in light of clearly established law. *Hanks*, 853 F.3d at 747.

Makani also points the Court to *Darden v. City of Fort Worth* in support of his contention that a constitutional violation occurs when an officer "violently slams an arrestee who is not actively resisting arrest." 880 F.3d 722, 731 (5th Cir. 2018). In *Darden*, the Fifth Circuit denied summary judgment on qualified immunity grounds to an officer who—during a drug raid of a private residence—choked, punched, kicked, twice tased, and force an asthmatic, obese arrestee (weighing 340 pounds) down onto his stomach, shoved his face into the floor, and pulled his hands behind his back for handcuffing. *Id.* at 725-27, 730-33. Moreover, the officers were told by others at the residence that the plaintiff—who died during the arrest—could not breathe. *Id.* at 726. *Darden* is also materially distinguishable from the case at bar.

First, the amount of force used in *Darden* far exceeded the amount of force Brewer used to gain physical control over Makani. Second, a genuine factual dispute existed in *Darden* as to

whether the arrestee was actively resisting arrest. There, conflicting testimony from the officers and eyewitnesses created a factual question. *Id.* at 730-31. While the evidence in *Darden* contained body camera footage of the raid, the footage did not capture significant portions of the officers' interactions and ensuing struggle with the arrestee. *Id.* at 730-31. Accordingly, the Fifth Circuit resolved evidence in favor of the plaintiff and determined that a reasonable jury could determine that the arrestee was not resisting arrest. *Id.* at 730. By contrast, the video evidence here captures the physical struggle at issue and discredits Makani's contention that he was not actively resisting. Thus, *Darden* does not satisfy Makani's burden of pointing the Court to a precedent that "squarely govern[s] the particular facts at issue here such that, in [June 2019], *no* reasonable officer would have thought that [Brewer's] takedown of [Makani] was legally permissible." *Tucker*, 998 F.3d at 176 (emphasis in original).

Finally, Makani relies on *Ramirez v. Martinez*, 716 F.3d 369 (5th Cir. 2013), in support of his assertion that it was objectively unreasonable for Brewer to "violently slam [him] face first to the marble floor when [he] was not presenting a threat." (Doc. 28, pg. 32). However, this case undercuts Makani's claim that his constitutional rights were violated and, even if it did not, is distinguishable from the case at bar. In *Ramirez*, the Fifth Circuit affirmed the district court's denial of summary judgment on qualified immunity grounds where an officer immediately tased a plaintiff who had pulled his arm away from the officer, forced the plaintiff to the ground even though the plaintiff was no longer resisting, and tased the plaintiff again after the plaintiff was handcuffed. *Ramirez*, 716 F.3d at 378.

First, the Fifth Circuit's ruling in *Ramirez* cuts against Makani's contention that he was not actively resisting. There, the Court held that "under Texas law, [the officer] could have reasonably concluded that [the plaintiff] committed the offense of resisting arrest when [the plaintiff] pulled

---

his arm away from [the officer's] grasp." *Id.* at 376 (concluding that the facts the plaintiff alleged did not make out a constitutional violation of false arrest when the officer testified that the plaintiff was arrested for resisting arrest). Second, the Fifth Circuit's ruling related to excessive force focused on: (1) the officer's use of a taser as an immediate response to the plaintiff's act of pulling his arm away from the officer; (2) the officer taking the plaintiff down to the ground when he was no longer resisting; and (3) the officer's use of the taser when the plaintiff was handcuffed on the ground. *Id.* at 378-79.

Makani relies on the Fifth Circuit's observation that the *Ramirez* plaintiff's action of "pulling his arm out of [the officer's] grasp, without more, is insufficient to find an immediate threat to the safety of the officers" to argue that the use of force against him was unreasonable. (Doc. 28, pg. 32) (citing *Ramirez*, 716 F.3d at 378). In doing so, however, Makani fails to recognize that the facts of *Ramirez* significantly differ from the facts here. There, the only crime the plaintiff was suspected of committing was resisting arrest by pulling his arm away from the officer. *Ramirez*, 716 F.3d at 378. Here, however, Makani was suspected of committing a serious offense of family violence. Moreover, Makani's resistance was more significant than the plaintiff in *Ramirez* as he refused to comply with Brewer's repeated verbal commands, spent twenty seconds trying to pull his arm away from Brewer, and grabbed Brewer's hand in an apparent attempt to free himself from Brewer's grasp. Finally, the plaintiff in *Ramirez* was surrounded by multiple officers in a parking lot in the middle of the day. *Id.* at 372. By contrast, Brewer was the sole responding officer to a domestic disturbance call at a little after 1:00 a.m., was engaged in a protracted struggle with an intoxicated individual, was pulled into the plaintiff's residence, was surrounded by multiple individuals, and did not know whether there were weapons in the home. Thus, the record before the Court "reflects the essential 'more' that was missing in *Ramirez*."

---

MEMORANDUM OPINION AND ORDER                                                    Page **23** of **38**

*Tucker*, 998 F.3d at 178  (citing *Ramirez*, 716 F.3d at 378)  (concluding that an officer's takedown of a plaintiff suspected of driving under the influence was not objectively unreasonable after the plaintiff did not  immediately pull over, led the officers into a high-crime area, exhibited escalating verbal and physical agitation, tensed up, and moved his arms away from the officers upon seeing that he was about to be handcuffed). For these reasons, *Ramirez* does not "squarely govern the particular facts at issue here such that, in June 2019, *no* reasonable officer would have thought that [Brewer's] takedown of [Makani] was legally permissible." *Tucker*, 998 F.3d at 176.

In light of the requirement that clearly established law be particularized to the facts of the case at bar, and Makani's failure to identify such law, the Court must conclude that Brewer is entitled to qualified immunity from Brewer's claim of excessive force. *See Batyukova v. Doege*, 994 F.3d 717, 729 (5th Cir. 2021) (affirming grant of summary judgment where the plaintiff "failed to identify clearly established law").

### B.      Count Two—Illegal Entry

#### *1.      Constitutional Violation*

The Court concludes that Brewer is entitled to summary judgment on Makani's illegal entry claim on the grounds of qualified immunity because Makani has not established that Brewer violated his Fourth Amendment right to be free from unreasonable searches. "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972). "It is 'a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). However, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Stuart*, 547 U.S. at 403 (citing *Flippo v.*

*West Virginia*, 528 U.S. 11, 13 (1999) (per curiam); *Katz v. United States*, 389 U.S. 347, 357 (1967)).

One such exception is the "emergency aid exception," under which "law enforcement may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Stuart*, 547 U.S. at 403 (citing *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)). "Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." *Michigan v. Fisher*, 558 U.S. 45, 48 (2009). Instead, for the emergency aid exception to apply, there must be "an objectively reasonable basis [for believing that] that a person within the house is in need of immediate aid." *Fisher*, 558 U.S. at 47 (internal quotation marks omitted); *see also Linicomn v. Hill*, 902 F.3d 529, 536 (5th Cir. 2018) ("Exigent circumstances exists where, inter alia, officers must enter a home to provide emergency assistance to preserve life or to prevent serious injury."). The exception "does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." *Fisher*, 558 U.S. at 47 (citing *Brigham City*, 457 U.S. at 404-05). "While avoiding the risk of second-guessing officers' actions based on 20/20 hindsight, [courts] must still ensure that, at the time the officer acted, there was reliable information of an 'urgent, ongoing emergency.'" *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, at 1132 (5th Cir. 2014) (citing *United States v. Timmann*, 741 F.3d 1170, 1180-81 (11th Cir. 2013)).

While the Fifth Circuit has not issued binding precedent on facts similar to those at issue here, two cases—one published, one unpublished—are instructive. In *Rice v. ReliaStar Life Ins. Co.*, the Fifth Circuit found that the emergency aid exception applied when officers entered a home without a warrant because the officers had an objectively reasonable basis for believing an individual would imminently injure himself. *Id.* There, officers responded to a 911 call from

---

MEMORANDUM OPINION AND ORDER                                          Page **25** of **38**

someone inside of the home. *Id*. The officers were aware of the contents of this call from dispatch and knew the following: (1) the individual was suicidal; (2) the individual had a gun; (3) the individual had been drinking; and (4) the individual was sitting in his truck, inside of his closed garage, holding a gun to his head. *Id*. Based on these facts, the Fifth Circuit determined that it was objectively reasonable for the officers to believe—based on the information relayed to them by dispatch—that warrantless entry into the home was necessary to protect the individual from himself. *Id.*

In its unpublished decision in *Cesar v. City of Eunice*, the Fifth Circuit held that the emergency aid exception applied when officers had received a credible report of domestic violence. 642 F. App'x 387, 389 (5th Cir. 2016) (per curiam).[1] There, police officers were responding to a report of a domestic disturbance and learned—while en route to the scene—that the plaintiff was attempting to fight his girlfriend and had struck one of her family members. *Id.* at 388. The officers made contact with the plaintiff near the apartment he shared with his girlfriend, but the plaintiff ignored their commands and ran away. *Id.* After searching for the plaintiff, the officers located him back at his apartment and broke down the apartment door after the plaintiff refused to open it. *Id.* at 388. Based on these facts, the Fifth Circuit held that the officers were entitled to enter the apartment to protect the plaintiff's girlfriend from potential harm. *Id.* at 389 (citing *United States v. Martinez*, 406 F.3d 1160, 1164-65 (9th Cir. 2005); *Tierney v. Davidson*, 133 F.3d 189, 197 (2nd Cir. 1998) ("Courts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger.")).

---

[1] "An unpublished opinion issued after January 1, 1996 is not controlling precedent, but may be persuasive authority." *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006) (citing 5th Cir. R. 47.5.4).

Turning to the facts at hand, the Court concludes that it was objectively reasonable for Brewer to believe that warrantless entry into the Makani residence was justified by the need to protect individuals within the home from potential harm. It is undisputed that: (1) Brewer's action of pushing the front door fully open and stepping inside of the home constituted a search under the Fourth Amendment; and (2) Brewer had neither a warrant nor consent to search the home. However, Brewer argues that this search was justified under the emergency aid exception to the Fourth Amendment's warrant requirement. (Doc 20, pg. 24). The Court concludes that it was. In light of the case law discussed above, the Court concludes that it was objectively reasonable for Brewer to believe that his entrance into the Makani home justified to protect individuals within the residence from the threat of imminent violence.

In the early morning hours of June 9, 2019, Brewer responded to a credible report of a domestic dispute. In doing so, he responded to a "Priority 1" call—offense against persons, in progress, on-going. (Doc. 21, pg. 47: Brewer Aff. ¶ 4). Based on communications he received from dispatch—both written and verbal—Brewer was aware of the following facts when he arrived at the Makani residence: (1) someone in the home had called 911; (2) the caller reported that an intoxicated man in his mid-twenties was fighting with people in the residence; (3) the man was hurting family members; (4) the man had broken a door; (5) the man was trying to get his car keys; (5) there may be weapons in the home; and (6) the 911 caller was hiding from the man because she was afraid of him. (Doc. 21, pgs. 47-48: Brewer Aff. ¶¶ 4-8). Brewer arrived at the home less than six minutes from the beginning of the 911 call and less than a minute after the dispatcher's final comment appeared on his squad car's in-unit computer screen. (Doc. 21, pg. 22: Event Report, pg. 7).

---

The parties dispute whether there was loud screaming or arguing when Brewer arrived at the Makani residence. Because Brewer's body camera footage is silent for the first thirty seconds, the recording does not corroborate either Brewer or Makani's version of the events as to whether a loud argument could be heard when Brewer arrived. Thus, making a finding as to whether such screaming and arguing could be heard would require the Court to make a credibility determination—which it may not do at this stage. *Anderson*, 477 U.S. at 255. Mindful that, under either prong of the qualified immunity analysis, it "may not resolve genuine disputes of fact in favor of the party seeking summary judgment[,]" *Tolan*, 572 U.S. at 656, the Court recognizes that there is a genuine dispute as to whether loud screaming and arguing could be heard when Brewer arrived at the Makani residence.

Nevertheless, in light of relevant Fifth Circuit case law, the Court concludes that it was objectively reasonable for Brewer to believe that warrantless entry into the Makani residence was necessary to protect the individuals within from immediate harm. Even if, *arguendo*, the Court accepted Makani's version of facts as true and assumes that there was no loud screaming or arguing when Brewer arrived, the Fifth Circuit's decision in *Rice* indicates that Brewer need not have heard such arguing or screaming to believe exigent circumstances existed. In *Rice*, the record did not indicate that the officers heard any sort of loud commotion when they arrived at the scene. *Rice*, 770 F.3d at 1132. Nonetheless, the Fifth Circuit found that the officers had an objectively reasonable basis for believing warrantless entry into the home was justified based on a credible report of imminent violence from someone inside of them home, of which they learned through their communications with dispatch. *Id*.

Like the officers in *Rice*, Brewer was aware of a credible report of imminent violence through their communications his dispatch. While the officers in *Rice* were aware that the

individual was armed and was only threatening to harm himself, Brewer had an even greater basis for believing exigent circumstances existed than the officers there. Unlike the officers in *Rice*, Brewer was aware that: (1) Makani had already physically harmed individuals inside of the home; and (2) at least one person in the home was hiding out of fear of continued violence. Moreover, the Fifth Circuit's decision in *Cesar*—albeit unpublished and non-binding, but nevertheless persuasive—supports Brewer's contention that a credible report of a domestic disturbance in which the suspect had allegedly already harmed someone within the home supports a determination that the emergency aid exception justified warrantless entry. *Cesar*, 642 F. App'x 389-90 ("[T]he officers received a credible report of domestic violence and were entitled [under the emergency aid exception to enter Cesar's home to protect his girlfriend . . . from potential harm.")

Thus, no fact issue exists as to whether Brewer's warrantless entry into the Makani residence was objectively reasonable under the circumstances, and the Court concludes that Makani has not established that Brewer violated his Fourth Amendment right to be free from unreasonable searches. As such, Brewer is entitled to qualified immunity from Makani's illegal entry claim.

2. *Clearly Established Law*

In the alternative, the Court concludes that Brewer is entitled to qualified immunity from Makani's illegal entry claim because Makani has not met his "heavy" and "demanding" burden of showing that Brewer's warrantless entry violated a clearly established right. *Morrow*, 917 F.3d at 874. Revoking qualified immunity is "an extraordinary remedy. To get it, [a plaintiff] must make an extraordinary showing." *Id.* at 877. Makani has failed to do so. He has not identified a controlling precedent that "'squarely governs' the facts at issue.'" *Kisela*, 138 S.Ct. at 1153 (quoting *Mullenix*, 577 U.S. at 13). Nor has he identified a robust consensus of persuasive authority

rendering it "beyond debate"—such that any reasonable office would know, under the totality of circumstances—that Brewer's action of pushing fully open the door to enter the Makani residence when responding to a credible report from within the home of domestic violence would violate the Fourth Amendment. *See al-Kidd*, 563 U.S. at 741.

As discussed above, to establish that that the law is clearly established, plaintiffs must point to "controlling authority—or a 'robust consensus of authority'—that defines the contours of the right in question with a high degree of particularity." *Morgan*, 659 F.3d at 371-72 (quoting *al-Kidd*, 563 U.S. at 742). The controlling authority need not be "directly on point" for a the law to be clearly established, but it "must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S.Ct. at 1153. With respect to the use of persuasive authority to argue that the law is clearly established, the Fifth Circuit has not identified the level of consensus required to put the relevant question beyond debate. *Morrow*, 917 F.3d at 879 (citing *al-Kidd*, 563 U.S. at 741). The bar, however, is high. *See McClendon v. City of Columbia*, 305 F.3d 314, 330-32 (5th Cir. 2002) (concluding that the adoption of the state-created-danger doctrine in six circuits was insufficient to create a robust consensus because the circuits were not unanimous in defining the doctrine's its "contours" or applying it "to a factual context similar to that of the instant case").

Makani points the Court to both Fifth Circuit and out-of-circuit case law in an attempt to show that it was objectively unreasonable for Brewer to believe that exigent circumstances justified his warrantless entry into the Makani residence in light of clearly established law. For the reasons discussed below, both lines of argument fail to do so.

(i)     Controlling Precedent

Makani fails to point the Court to any controlling precedent that "squarely governs the facts at issue." *Kisela*, 138 S.Ct. at 1153 (citation and quotation marks omitted). Makani cites only one controlling case in which an officer's warrantless entry into a residence under the auspices of the

emergency aid exception was held to be a violation of the Fourth Amendment. Makani makes passing reference to *Brigham City v. Stuart* and *Michigan v. Fisher*, both of which are Supreme Court cases in which the emergency aid exception was found to apply. These cases do nothing to put Brewer on notice that entering the Makani residence six minutes after someone within the home reported that violence had occurred and that they were afraid of continued violence was not justified under the emergency aid exception. He also cites to dicta in the Supreme Court's decision in *Georgia v. Randolph*, quoting in a parenthetical the Court's statement that police officers have the "authority . . . enter a dwelling to protect a resident from domestic violence[] so long as they have good reason to believe such a threat exists." *Randolph*, 547 U.S. at 118. However, "clearly established law comes from holdings, not dicta." *Morrow*, 917 F.3d at 875. Moreover, even if dicta could constitute clearly established law, *Randolph* actually cuts against Makani's position. As the Court discussed at length above, Brewer had good reason to believe that entering the Makani residence was necessary to protect individuals in the home from violence. *See supra* III.B.1.

Makani points the Court to only one case constituting controlling precedent in which a court found that the emergency aid exception did not apply—the Fifth Circuit's decision in *United States v. Troop*, 514 F.3d 405, 409 (5th Cir. 2008). However, Makani merely cites this case, does not discuss its facts, and makes no attempt to explain how it "'squarely governs' the specific facts at issue." *Kisela*, 138 S.Ct. at 1153 (citation and quotation marks omitted). A brief analysis of *Troop* reveals that it does not.

In *Troop*, the Fifth Circuit held that emergency aid exception did not apply when border patrol agents concluded that the individuals they were tracking were in need of immediate medical assistance—based solely on the fact that their footprints showed signs of fatigue. *Troop*, 514 F.3d at 410. The *Troop* court found that signs of fatigue alone, absent evidence "of medical distress

---

MEMORANDUM OPINION AND ORDER                                                    Page **31** of **38**

requiring immediate aid, such as loss of blood, signs of physical illness, or evidence that the individual had been carried or dragged," did not constitute exigent circumstances justifying immediate entry into the house. *Id.*

This case at bar is distinguishable from *Troop* on two grounds. First, the border patrol agents in *Troop* entered the residence for a different reason that Brewer did in the case at hand. There, the agents argued that it was objectively reasonable for them to believe that the individuals needed medical assistance. *Troop*, 514 F.3d at 410. Here, Brewer argues that it was objectively reasonable for him to believe that he needed to enter the Makani residence to prevent imminent violence to those inside. (Doc. 20, pgs. 28-29). That alone renders *Troop* distinguishable from the case at bar.

Second, the agents in *Troop* based that determination on fewer facts than Brewer did. There, the agents based their determination solely on the fact that the footprints leading to the house in question "became more scuffed and had less pronounced toe indentations than at first, which indicated that the individuals were fatigued." *Troop*, 514 F.3d at 407. Here, Brewer acted in response to a 911 call from inside the Makani residence indicating that Makani was intoxicated, had harmed individuals in the home, and that the caller was hiding from Makani out of fear. Because the 911 call asking for assistance could reasonably be construed as evidence that Brewer needed to enter the house to prevent imminent harm to those inside, *Troop* does not clearly establish that Brewer's actions were objectively unreasonable in light of clearly established law. *See Linicomn*, 902 F.3d at 536 (finding that *Troop* did not squarely govern the facts at issue because an estranged mother's 911 call asking for assistance to check on a sick and lethargic child who was living with the father could have reasonably been construed as evidence that the children were in need of medical assistance). Thus, *Troop* is not "controlling authority . . . that defines the

---

MEMORANDUM OPINION AND ORDER                                              Page **32** of **38**

contours of the right in question with a high degree of particularity" as required by the Fifth Circuit. *Hogan v. Cunningham*, 722 F.3d 725, 735 (5th Cir. 2013).

Because Makani does not cite any controlling authority establishing that Brewer's entry into the home in response to a credible report of domestic violence from an individual within the home would have violated a clearly established right, the Court next turns to Makani's argument that a robust consensus of persuasive authority clearly establishes that Brewer's conduct was unlawful.

(ii)    Persuasive Authority

When a plaintiff points to a purported robust consensus of persuasive authority to argue that the law is clearly established, courts must assess those decisions to determine whether they define the relevant legal rule with "sufficient clarity to provide a reasonable officer in [the defendant's] position with fair warning that" his conduct would violate the plaintiff's rights. *McClendon*, 305 F.3d at 331. Makani provides a cavalcade of string citations to out-of-circuit cases in an attempt to argue that a robust consensus of persuasive authority establishes that Brewer's entry into the home violated clearly established law. However, Makani makes no attempt to describe how these cases define the contours of the emergency aid exception with sufficient clarity to put Brewer on notice that his actions would violate the Fourth Amendment. A review of these cases reveals that they do not demonstrate that the specific acts at issue here violated clearly established law.

Makani only cites three out-of-circuit cases that could arguably be considered similar to the case at hand insofar as they involved warrantless entry by officers responding to reports of violent disturbances. However, these cases do not present situation analogous to the one faced by Brewer on June 9, 2019, because they do not involve situations where an individual inside of the residence called 911 and reported that: (1) an individual in the residence had already harmed

people in the home; and (2) the caller was hiding from that individual out of fear of further violence.

First, Makani cites *United States v. Davis*, where the Tenth Circuit found that the exigent circumstances exception did not apply where: (1) police officers responding to a reported domestic disturbance did not hear noises from outside of the residence; and (2) the wife appeared at the front door and resisted her husband's efforts to close the door. 290 F.3d 1239, 1244 (10th Cir. 2002). However, nothing in that decision indicates that the police responded to a call from within the home from someone who had already witnessed violence and was hiding in fear. Makani also points to the Tenth Circuit's decision in *Storey v. Taylor* in support of his assertion that the report of a loud argument that has ceased when officers arrived—without more—does not constitute exigent circumstances. 696 F.3d 987, 996 (10th Cir. 2012). This argument suffers from the same defects as Makani's reliance on *Davis*. In *Storey*, the officers responded to an anonymous call from someone who had overheard the loud argument from outside of the residence, *id.*, not a call from within residence by someone who witnessed violence and was hiding out of fear of continued violence

Makani's reliance on a decision of the Nevada Supreme Court is also misplaced. In *Hannon v. State*, police officers responded to a 911 call of a possible domestic disturbance from a neighbor who overheard a loud argument between the defendant and his girlfriend in their apartment next door. 207 P.3d 344, 345 (2009), *as modified* (June 2, 2009). There, the officers entered the apartment without a warrant when they arrived forty-five minutes after the 911 call and the domestic disturbance and seemingly dissipated. *Id*. at 348. The Nevada Supreme Court suppressed evidence gathered during that warrantless entry, holding that the emergency aid exception did not apply because the officers had no reason to believe that the defendant or his girlfriend had been

injured or that there was a third person within the residence in need of emergency assistance. *Id*. Again, however, this case does not support the assertion that it was objectively unreasonable for Brewer to believe that the emergency aid exception applied when he responded to a 911 call from inside of the residence—made from inside the residence only six minutes prior—indicating that violence had already occurred and that at least one person inside the home was afraid that the violence would continue.

Makani also cites a number of cases where sister circuits have held that the emergency aid exception did not apply in situations that are entirely distinguishable from the case at bar. He cites *United States v. Moss*, in which the Fourth Circuit held that the emergency aid exception did not apply when a park ranger entered a supposedly unoccupied cabin because he saw an illegally parked vehicle in front of it and feared that the owner might be lost or hurt. 963 F.2d 673 (4th Cir. 1992), *as amended* (May 21, 1992). He also cites *United States v. Washington*, where the Sixth Circuit held that "an ongoing criminal trespass, on its own, constitutes an exigency that overrides the warrant requirement" for officers who entered an arrestee's home without a warrant seven days after arresting him, based on his landlord's report that there had been a "great deal of foot traffic" into the apartment and that "a tenant had seen one man enter the unit with a gun." 573 F.3d 279, 287-289 (6th Cir. 2009). Next, Makani cites *Sandoval v. Las Vegas Metro. Police Dep't*, in which the Ninth Circuit held that the emergency aid exception did not apply when an officer "arrived at a home to find a pattern consistent with either lawful or unlawful activity, but with no evidence of weapons, violence, or threats" 756 F.3d 1154, 1165 (9th Cir. 2014), *cert denied*, 574 U.S. 1153 (2015). There, however, the officer—responding to a 911 call about two white males casing a neighborhood house—entered a different home after seeing Hispanic teenagers through a window who did not match the description conveyed in the 911 call. *Id.* Finally, Makani cites *United States*

*v. Hill*, pointing out that the Fourth Circuit held that that exigent circumstances did not exist based on officers' observations that: (1) the door to the residence looked like it had been kicked in; (2) noise inside of the home but no response to officer's inquiries; (3) it sounded like someone attempted to lock the door; and (4) the occupant had previously called *weeks before* to remove the defendant from the home. 649 F.3d 258, 265 (4th Cir. 2011). There, however, officers had an arrest warrant for the arrestee, went to the home to ask the occupant about the arrestee's whereabouts, and had expressed no basis for believing that anyone inside of the home was in need of assistance. *Id.* None of these cases are similar to the case at bar insofar as they do not involve situations in which officers responded to a 911 call from inside of a home indicating that violence had already occurred and at least one person within the home was afraid that the violence would continue.

Moreover, Makani cites cases in which sister circuits have held that the emergency aid exception did apply, which do nothing to put Brewer on notice that his actions violated clearly established law. Makani cites *United States v. Layman*, an unpublished Tenth Circuit decision in which the court found that warrantless entry was permissible based on information that the plaintiff—a wanted felon—was staying in the residence and the officers detected a strong chemical smell indicating that if someone was inside, that they may be unconscious or incapacitated. 244 F. App'x 206, 208-209 (10th Cir. 2007). Makani also cites *United States v. Taylor*, where the Fourth Circuit held that emergency aid exception justified warrantless entry into a house when the police sought to identify the parents of a four-year-old child who was found wandering nearby alone and had identified the house as where she lived. 624 F.3d 626 (4th Cir. 2010). However, these cases do not further Makani's argument that Brewer's conduct was unreasonable under the circumstances facing him on the morning of June 9, 2019.

Finally, Makani cites to dicta in two out-of-circuit cases to further his argument that a robust consensus exists. (*See* Doc. 28, pg. 22-23) (citing *Timmann*, 741 at 1179 (observing that cases applying the emergency aid exception "have in common the indicia of an urgent, ongoing emergency, in which officers have received emergency reports of an ongoing scene, arrived to find a chaotic scene, and observed violent behavior, or at least evidence of violent behavior"); *Nelms v. Wellington Way Apartments*, LLC, 513 F. App'x 541, 545 (6th Cir. 2013) ("[E]ach time this court has upheld a warrantless entry based on the emergency aid exception, credible and reliable evidence established the potential for injury to the officer or others and the need for swift action.")). Even if the cited portions of these cases supported Makani's argument that Brewer violated clearly established law—which they do not—plaintiffs may not rely on dicta to argue that an officer's conduct violates clearly established law. *See Morrow*, 917 F.3d at 875 ("[C]learly established law comes from holdings, not dicta.") (citations omitted).

Thus, Makani has failed to show that a robust consensus of persuasive authority demonstrates that it was clearly established on June 9, 2019, that the specific act at issue here—an officer's entry into a home to which he was called to investigate a credible report of violence that came from within the home—violated the Fourth Amendment. *McClendon*, 305 F.3d at 331. Because Makani has neither identified controlling precedent nor a robust consensus placing this question beyond debate, he has not carried his heavy burden of demonstrating that Brewer's actions violated clearly established law. *See Morrow*, 917 F.3d at 876-880 (5th Cir. 2019) (affirming summary judgment granting qualified immunity because appellant did not identify controlling precedent or a robust consensus of persuasive authority). Accordingly, the Court must conclude that Brewer is entitled qualified immunity from Makani's illegal entry claim.

## IV.   Conclusion

---

For the reasons discussed above, the Defendant Michael Brewer's Motion for Summary Judgment, (Doc. 19), is **GRANTED**. Accordingly, all of Plaintiff Rasool Makani's claims against Defendant Brewer are hereby **DISMISSED WITH PREJUDICE.**

**SO ORDERED:** April 6, 2023.

Ada Brown
UNITED STATES DISTRICT JUDGE